[No. 9276.    Department One.    February 17, 1911.]

HERMAN ALLENBERG *et al.,* *Plaintiffs,* v. MORTON D.
WAINWRIGHT *et al.,* *Respondents,* AND EQUITABLE LIFE
ASSURANCE SOCIETY OF THE UNITED STATES,
*Intervener and Appellant.*[1]

EVIDENCE—PAROL TO EXPLAIN WRITING—CONTRACTS—CONSTRUCTION—AMBIGUITY.  Receipts for advances, given by general agents to an insurance solicitor, are not so clear and certain as to exclude oral evidence of the real intention of the parties as to the solicitor's personal liability thereon, where they provided that the sum with interest shall constitute a lien upon and be repaid from "commissions and percentage allowances accruing to me," and that "any balance outstanding upon the termination of my contract arrangements shall thereupon become immediately due and payable by me in cash;" the solicitor having been arbitrarily discharged without cause assigned within one year, and the percentages accruing for twelve years if policies were kept up that long.

SAME.  The same is also true of similar receipts, providing for repayment in cash of the sum received, with interest, on a date left blank, and that the "advance shall constitute a lien upon and be repaid" from the commissions and percentages, as in the other case.

INSURANCE—COMMISSIONS—ADVANCES TO AGENT—LIABILITY FOR REPAYMENT.  Where such receipts were given with the understanding that the advances were to be repaid only out of commissions and percentages accruing to the solicitor, he cannot be held personally liable thereon, especially where he was arbitrarily discharged without cause assigned before the lapse of the time within which percentages might accrue.

SAME—RIGHTS OF COMPANY—BILLS AND NOTES—BONA FIDE HOLDER.  In such a case, where suit was brought by the general agents, and the insurance company intervened as the real party plaintiff, the company cannot claim to be a *bona fide* holder of the receipts for value, the intervention appearing to be based upon the theory that acceptance of the receipts by the general agents was the act of the company.

Appeal from a judgment of the superior court for King county, John S. Jurey, Esq., judge *pro tempore*, entered

[1]Reported in 113 Pac. 585.

June 7, 1910, upon findings in favor of the defendants, after a trial on the merits before the court without a jury, in an action on contract. Affirmed.

*H. A. P. Myers* and *Walter L. Johnstone,* for appellant.

*Philip Tindall, Vince H. Faben,* and *S. H. Kelleran,* for respondents.

PARKER, J.—This action was commenced by the plaintiffs to recover from the defendants $1,981.47, alleged to be due upòn a number of obligations in writing, which for convenience we will call receipts, signed by the defendant, Morton D. Wainwright. These receipts were all in one or the other of the following forms:

"Oct. 30, 1905.

"Received of Allenberg & Fleming the sum of twenty-five dollars ($25) as an advance, upon the understanding that until said amount shall have been fully repaid with interest, the same shall constitute a lien upon and be repaid from any and all first year's and renewal commissions and percentage allowance accruing to me in any manner whatsoever, with interest at the rate of five per cent (5%) per annum, to be computed up to and paid annually on the 31st day of December in each year; any and all compensation accruing being applied first to the payment of interest upon the total indebtedness on said December 31st in each year and afterwards to the payment of the principal sum then due; it being further understood that any balance outstanding upon the termination of my contract arrangements shall thereupon become immediately due and payable by me in cash with interest.

"Approved, A. & F.          Morton D. Wainwright."

"5-3-04.

"Received of Allenberg & Fleming the sum of twenty-five dollars ($25) as an advance, which I agree to repay in cash, with interest at the rate of five per cent (5%) per annum, by ............ 190.., and until repaid with interest. I hereby agree that said advance shall constitute a lien upon and be repaid from any and all first year's and renewal commissions and percentage allowance accruing to me in any manner

whatsoever, with interest at the rate of five per cent (5%) per annum; the understanding being that any and all renewal commissions accruing to me shall be applied first to the payment of interest upon the total indebtedness, and afterwards to the payment of the principal sum then due, until the same shall have been fully paid.

"Approved, A. & F.      Morton D. Wainwright."

These receipts were all printed forms with no blanks, save for the date, for the name of the plaintiffs, for the amount, and in the second form, for the date of maturity. The blank in the second form for inserting the date of maturity was left unfilled in all the receipts of that form. After the commencement of the action, the Equitable Life Assurance Society intervened, claiming to be the real party in interest as plaintiff. A trial before the court resulted in findings and judgment in favor of the defendants. The intervener has appealed.

The construction of the receipts sued upon, and the admission of oral evidence touching the defendants' personal liability thereunder, are the questions involved. It is contended in behalf of the intervener that these receipts evidence absolute personal debt obligations on the part of the defendants, which cannot be varied or explained by parol evidence, and that no question of fact is properly in the case save the question of the amount of credits the defendants are entitled to upon such obligation. It is contended in behalf of the defendants that these receipts do not evidence personal indebtedness against them; that if it be held that a strict construction of the language of the receipts does evidence such an indebtedness, then that they were signed under a mutual mistake on the part of both defendant Morton D. Wainwright and the plaintiffs as to the import of the language therein used; that the evidence introduced and admitted by the court to show the real nature of the obligation intended by the parties was admissible; and that the defendants are not liable beyond the commissions accruing to the defendant Morton D. Wainwright.

upon insurance procured and written by him for the intervener and the plaintiffs, its general agents.

The facts are practically undisputed, and so far as necessary for us to notice them, are as follows: At the time of the signing of these receipts by the defendant Morton D. Wainwright, the plaintiffs were the general agents of the intervener, located at Seattle, and acting as such under the firm name of Allenberg and Fleming. They were authorized to employ subordinate agents to solicit insurance for the intervener, and accordingly employed Morton D. Wainwright, who was to receive certain commissions upon the insurance procured by him, not only upon the first year's premiums, but also upon the premiums to be paid thereon from the second to the twelfth years inclusive. The contract for this employment was in writing, under which the employment was to continue until March 13, 1906. About the time of making the contract, a considerable prejudice had been excited in the public mind against certain life insurance companies, including the intervener, and it was found very difficult for solicitors to procure insurance. Wainwright discovered this difficulty, and after four or five months' trial he became so discouraged that he announced to plaintiffs his desire to discontinue the work. The plaintiffs, however, were anxious to have him continue his efforts, and urged him to do so, which he did, though he afterwards, on other occasions, expressed a desire to discontinue for the same reason, but was on these occasions again urged and induced by plaintiffs to continue. He procured some insurance, but not sufficient to enable him to pay his expenses out of his commissions upon the first year's premiums, including a fixed expense amount allowed him under his written contract of employment. The plaintiffs thereupon agreed to advance him from time to time whatever additional amounts he might need for expenses. He claims that he consented to this upon the understanding with the plaintiffs that all such advances should be payable only out of commissions accruing to him, and that in no event was he to be held personally

liable to repay such advances. All of the evidence upon this question was the testimony of Wainwright himself. No effort was made to contradict his testimony upon this subject. The intervener evidently relied upon its contention that such evidence was inadmissible. Wainwright's testimony relative to this arrangement is as follows:

"A. The conditions were such that we could not get any business and I went to Mr. Fleming after I had been there a few months and told him I did not care to continue under the conditions and there was no opportunity for me to make a living out of it under the original contract, and he stated that he wanted me to stay, that he would not hold me to the original contract, and that he would advance me, if I remembered correctly, $25 a week to live off of and pay my expenses, and he insisted upon my staying. Q. State whether that conversation—whether that was a single conversation or whether you had such conversation more than once? A. We had such conversation three or four different times. Q. And what was the burden of his request to you and promise to you on each conversation? A. That there would be nothing held up against me in regard to the advances in any way, shape or manner. Q. What, if anything, was the understanding with regard to the manner or conditions under which these advances were to be repaid? A. There was no agreement made between Mr. Fleming and I that that should ever be repaid to Allenberg & Fleming or to the Equitable Life Insurance Company. It was money they advanced to get out and do all I could in the interests of the Equitable Life Insurance Company, and if there was anything to gain by that they would gain, and if anything they would lose, they would lose. Their object was to keep as many men in the field as possible to keep up the appearance from the exposures that were being made through the magazines. Q. Possibly you do not grasp the exact purport of the question. Was there any understanding as to any manner in which Allenberg & Fleming were to be reimbursed, if at all? A. Through the premiums and renewals. Q. Explain what you mean by that? A. The percentage on the first year's payments and a renewal for 12 years afterwards on those premiums, as long as the policy was in force up to 12 years, if I remember correctly it always was run for 12 years. Q. That is the rate set forth in the contract? A.

Yes, sir, the rate set forth in the contract.   Q. And those commissions that would be due to you on that account were to apply on these advances?   A. On money advanced to me, yes, sir. . . . Q. Now I wish you would state just the circumstances under which you signed up these slips that we have in evidence here, just tell how you came to sign these papers? A.   When I first talked with——was introduced to Mr. Fleming and went up to talk with him, and he told me what the contract was and so forth, and had one filled out.   I took it home and read it.   It was a week or two before I signed it and I accepted the contract and worked on it for a while and I saw that it was impossible to make good, and I was going to quit and he got me to remain with the positive understanding that there would be nothing charged up to me in any way, shape or manner.   He said 'The only thing is we have to have a contract of this sort'— Q. You do not understand me, I say these slips here?   A. I am going to get to that. And he said 'Whenever you need any money go to the cashier and get it and sign a receipt.'   So whenever I needed any money or wanted any advances or anything I would notify the cashier and the cashier would hand it out to me with one of these slips through the window, and I just noticed the heading, received from Allenberg & W. M. Fleming or Allenberg & Fleming, and supposed that was nothing but a receipt, and I would sign them.   I never read one of them in my life until this case was started.   Q. Did you have any idea that you were signing anything that might be construed as an agreement on your part to absolutely repay these advances?   A. No, sir.   Q. State whether or not you ever had any intimation made to you or received any suggestions that there was. any contention on the part of Allenberg & Fleming or anybody else on their behalf or representing them, or connected with them, that these slips which you signed and which are in evidence here were to be regarded as obligating you personally to repay these funds?   A. Never was anything, I knew nothing of it.   Other than they were said to be receipts.   Q. Otherwise than out of commissions?   A. Out of commissions and renewals, yes, sir.   Q. When did you first learn that such a contention was made?   That those were regarded by Allenberg & Fleming and by the life insurance society as absolute promises by you to repay?   A. After this case started."

This action was commenced in April, 1909. The last of the receipts sued upon was signed in December, 1905, more than three years before the commencement of this action. Wainwright was arbitrarily discharged from his employment without any cause being assigned or shown, in January, 1906, before the expiration of his agreed term of employment. This, it will be noticed, was also over three years before the commencement of this action.

Passing, for the present, the question of the admissibility of this evidence, other than the receipts themselves, for the purpose of showing the real understanding of the parties as to the defendants' personal liability, we cannot escape the conclusion that in the advancing of these sums to Wainwright and the taking of the receipts from him in this manner it was not intended that the money should be repaid by him other than from commissions accruing to him upon the premiums falling due and collected upon insurance procured by him, and that it was not the intention of the parties to this arrangement to render him personally liable for such advances. His testimony clearly so indicates, and it was evidently upon this theory that the learned trial court so held. This conclusion, however, cannot prevail if the receipts upon their face are such as to render the defendants' personal liability certain, and there was no mistake in the execution of the receipts; for in that event the receipts cannot be varied by parol evidence. This brings us to the question, are these receipts so certain in their language as to exclude parol explanation?

The first form of receipt, it will be noticed, provides that the advances "shall constitute a lien upon and be paid from any and all first year's and renewal commissions and percentage allowance accruing to me," etc. This language seems to clearly provide for the repayment of the advances from a specific fund, and if it was not for the last provision in this form of receipt we would have little difficulty in deciding that no personal obligation was created by its terms. The last provision of the receipts provides for the payment of these

advances in cash "upon the termination of my contract arrangements." It might be argued that the termination of these contract arrangements meant at the end of twelve years when Wainwright's right to commissions would expire, assuming that some of the insurance procured remained alive that long; or that it meant the termination of his contract arrangements by his own voluntary act, or because of some act of his entitling the plaintiffs or the intervener to terminate all his rights under his employment contract. We have seen the employment was not terminated for such cause. Counsel for intervener seem to argue that this last provision means the termination of the employment contract regardless of the cause of such termination. We cannot give our assent to this latter contention, and do not think that the form of receipt upon its face is so clear and certain as to exclude oral evidence, such as was here offered, to show the real understanding of the parties as to the defendants' personal liability.

The second form of receipt does not state any specific time for repayment. The blank on that form for that purpose was left unfilled in each receipt. It is true that form provides, "I agree to repay in cash with interest," etc., but it also provides "said advance shall constitute a lien upon and be repaid from any and all first year's and renewal commissions and percentage allowance accruing to me," etc. It may well be argued that this constitutes an agreement to repay only from a specific fund. In any event, we think that a personal liability is not, by this form of receipt, so clearly fixed upon the defendants as to exclude the oral evidence admitted by the court to show the real understanding between the parties.

Some contention is made that the intervener stands in the position of an innocent holder of these receipts, and that therefore it is bound only by the language of the receipts. We are not inclined to look with favor upon this contention, in view of the relation existing between it and its general agents, the plaintiffs. While these receipts were given to the plaintiffs, we are of the opinion that the record shows that

the acceptance of them in the first instance was as much the act of the intervener as that of the plaintiffs. Indeed, the intervention seems to have been based upon that theory.

Under all the circumstances shown, we conclude that there was no personal liability created against the defendants by the signing of these receipts by Morton D. Wainwright. The judgment is affirmed.

Dunbar, C. J., Mount, Fullerton, and Gose, JJ., concur.